**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**JEFFREY MALKAN,**

                              **Plaintiff,**

**v.**

                                                            **12-CV-0236A(Sr)**

**MAKAU W. MUTUA, et al.,**

                              **Defendants.**

---

## REPORT, RECOMMENDATION AND ORDER

        This case was referred to the undersigned by the Hon. Richard J. Arcara,

in accordance with 28 U.S.C. § 636(b), for all pretrial matters and to hear and report

upon dispositive motions.  Dkt. #22.


        Currently before the Court is Jeffrey Malkan's motion for sanctions against

defendant Makau Mutua and his attorney, Assistant Attorney General ("AAG"), David

Sleight (Dkt. #70), and Makau W. Mutua's motion for sanctions against Jeffrey Malkan

his attorney, Rick Ostrove, and Leeds Brown Law, P.C. Dkt. #83.  For the following

reasons, it is recommended that  sanctions be denied as to Mr. Mutua and AAG Sleight

and that sanctions be imposed against Mr. Malkan and Mr. Ostrove.


## FACTS

        Mr. Malkan commenced employment as an Associate Clinical Professor

and Director of Research and Writing for the State University of New York ("SUNY")

Buffalo Law School in the Fall of 2000.  Dkt. #70-2, p.7.

On April 28, 2006, the Committee on Clinical Promotion and Renewal

("CCPR"), met to discuss the promotion of Professor Malkan to Clinical Professor.  Dkt.

#70-2, p.39, ¶ 4.  The following faculty were in attendance: Makau Mutua, Susan

Mangold, Diane Avery, Errol Meidinger, Elizabeth Mensch, Fred Konefsky, George

Kannar, Tony Szczygiel, Rob Steinfeld, Rebecca French, Bert Westbrook, Shubha

Ghosh, Janet Lindgren, Marcus Dubber, Stephanie Phillips, Barry Boyer, Jim Gardner,

Guyora Binder and Isabel Marcus.  Dkt. #70-2, pp.15-17.


Professor Mangold, who chaired the meeting due to the absence of Dean

Olsen, testified at her deposition that there was "a lot of discussion about the Research

and Writing Program" at the meeting.  Dkt. #70-2, p.27.  Professor Steinfeld testified

that

> it was a long contentious meeting, there were strong
> opponents of his promotion.  Went on for a long time and
> the way I recollect things, after a certain amount of time had
> gone by and there was confusion in the meeting having to
> do with the research and writing program versus Professor
> Malkan's promotion and at a certain point I believe it was I
> who made a motion to separate the two decisions. That is,
> one vote . . . for promotion and tenure and another vote on
> what to do about the structure of legal research and writing.
> What I remember about that is that the vote – there was a
> vote in favor of Professor Malkan's promotion to clinical
> professor.  It was a close vote I remember.  It was by one or
> two votes.  And when it came to deciding upon what was to
> be done about the research and writing program, the . . .
> Committee voted to study it and let it go on for another year
> and then in a year come back and consider what was to be
> done about the research and writing program.

Dkt. #70-2, p.34.  Professor Avery similarly testified that the meeting became

acrimonious and that the CCPR decided to bifurcate the issue of Professor Malkan's

promotion to Clinical Professor from the discussion of the Research and Writing

Program.  Dkt. #70-2, pp.14 & 17.  Professor Avery's notes indicate that the vote was 9

in favor of promoting Professor Malkan to the position of Clinical Professor, with seven

opposed and three abstentions.  Dkt. #70-2, p.14.  Professor French, Professor Ghosh,

Professor Konefsky, Professor Mangold, Professor Marcus and Professor Steinfeld

each declare that the CCPR voted by secret ballot to recommend that Mr. Malkan be

promoted to Clinical Professor.  Dkt. #70-2, pp.41, 43, 45, 47, 49 & 53.


>Professor Mutua testified at his deposition that
>
>It was a very heated meeting, but I think people . . . were concerned that the program was not doing what it should have done for our students, that was the overwhelming concern of the faculty members.  I think that . . . people felt that Jeff should be removed from that position so that we could find someone who could . . . lead a good program for our students.
>
> * * *
>
>So the discussion continued and at some point, I think people began to feel that although we felt that Jeff should be removed, that we should not simply throw him out into the street immediately, that we should give him a year, a terminal year and then instruct or ask the Dean to form a faculty committee to study the program and come back with recommendations of how the program could be recreated.

Dkt. #70-2, p.57.  Thus, Professor Mutua recalled that the CCPR voted

>to recommend to the Dean that he give Mr. Malkan a terminal one year appointment and then establish a committee to study the program and make recommendations for change.

Dkt. #70-2, p.58.  Professor Mutua reiterated that he remembered "very clearly" that

"[t]here was only one vote, which was to extend him for another year as Director of the

program." Dkt. #70-2, p.61.  He testified that the vote

> was very close . . . something like 6 to 5 with maybe two
> abstentions.  I can't recall, something like that.  Because I
> remember someone asking whether a 6 to 5 vote with two
> abstentions was an affirmative vote.

Dkt. #70-2, p.59.  Professor Mutua couldn't recall who asked that question, but did

"remember the person who answered the question was the former President Bill

Greiner who said yes, it's an affirmative vote. "  Dkt. #70-2, p.59.  Professor Avery

declares that Professor William Greiner was not in attendance at this meeting.  Dkt.

#70-2, p.40.


By letter dated October 19, 2006, Dean Olsen advised Professor Malkan

of his promotion to Clinical Professor and the renewal of his appointment as Director of

Research and Writing.  Dkt. #63-3, pp. 7-8.


Professor Mutua was appointed Interim Dean of the Law School in

December of 2007.  Dkt. #63-8, ¶ 40.  Effective March 13, 2008, Dean Mutua relieved

Professor Malkan of his duties as Director of the Research and Writing Program.  Dkt.

#56-21, p.4.  By letter dated August 28, 2008, Dean Mutua advised Professor Malkan

that his three-year term appointment as Clinical Professor ending on August 31, 2009

would not be renewed and that his last day of work would be May 15, 2009.  Dkt. #63-2,

p.67.


The United University Professions, New York State United Teachers, AFT,

Local 2190, AFL-CIO ("Union"), filed an improper practice charge on Professor

Malkan's behalf, alleging that the Law School violated the Public Employees' Fair

Employment Act when it did not renew his appointment as Clinical Professor.  Dkt. #70-

3, p.8.  Specifically, the Union alleged that Dean Mutua decided not to renew Professor

Malkan's appointment as Clinical Professor in retaliation for Professor Malkan seeking

the Union's assistance to meet with Dean Mutua regarding his termination as Director

of the Research and Writing Program.  Dkt. #72-1, pp.4-5.


       At the Public Employee Relations Board ("PERB"), hearing on April 1,

2010, Dean Mutua testified regarding the CCPR meeting on April 28, 2006 as follows:

> The meeting began on a note of controversy, in which
> faculty members argued that the purpose of the meeting
> was not clear.  The reason for that was because faculty
> members asked how Jeff Malkan could be promoted from an
> associate clinical professor to a full clinical professor when
> he was not teaching in clinics in the first place, and many
> questioned why he had been appointed in the first place or
> been given the title of an associate clinical professor when
> he was not a clinical professor.  But that discussion was . . .
> put aside and we focused our attention on discussing Jeff
> Malkan's suitability as director of the research and writing
> program and that discussion was very heated.  Faculty
> members were disappointed about the nature of this
> particular program.  I can say that I have not been in many
> faculty meetings where emotions ran so high and, you know,
> much of the angst was about why the dean and the faculty
> had not responded to the very poor state of the legal
> research and writing program and why no one had, you
> know, brought up the matter of Jeff Malkan's leadership of
> the program to a faculty meeting for discussion.  It was felt
> by many that . . . Jeff Malkan should not continue to be
> director of this program, that we should not reappoint him
> because he had failed utterly as director of the program, to
> lead it, and that we should scrap the program and start from
> scratch by rethinking the entire program,.
>
> So this particular meeting resolved two things.  One, that Mr.
> Jeff Malkan should be given an additional year as director of

> the program, after which we would look for a new director of
> the program.  The reason for this additional year was to give
> us more time to look for a new director and to give Mr.
> Malkan time to look for employment elsewhere.  The second
> resolution of that particular faculty meeting was that the
> dean would be asked to appoint a committee of the faculty
> to study the program and to reconstruct it from the ground
> up.  These were the two resolutions of this particular
> meeting.

Dkt. #72-2, pp.3-4.  When asked if the faculty took any action regarding Professor

Malkan's promotion, Dean Mutua responded:

> I do not recall the faculty acting on that part of . . . the
> agenda of the meeting.  The discussion regarding Jeff
> Malkan's directorship of the program was so heated and . . .
> so expressive . . . that the faculty was consumed at that
> particular issue and once we decided on these two
> resolutions, the meeting broke up.

Dkt. #72-2, p.5.  Dean Mutua admitted that he

> was one of the main advocates for the position that we
> should terminate Jeff Malkan immediately, not even granting
> him an additional year to transition.  I made the argument
> before the faculty that we should not give him one more
> year, because we did not have an additional year to waste
> on our students, without giving them a quality product in this
> particular program. I felt that we would be wasting our
> students' resources and time to allow him to continue as
> director of the program.  I made this particular case.  The
> faculty in its wisdom decided . . . to give him one year, and
> so there was disagreement between myself and most of the
> faculty on that situation.

Dkt. #72-2, p.5.   Dean Mutua reiterated that the Committee "did not vote on his faculty

appointment."  Dkt. #72-2, p.9.


The Administrative Law Judge's ("ALJ's"), Decision recounted Dean

Mutua's testimony regarding the CCPR meeting, but noted that the CCPR's actions

"were not binding on the Dean," and that plaintiff was, in fact, appointed to the position of Clinical Professor. Dkt. #70-3, p.10. As to the merits of the charge, the ALJ determined that the evidence supported the State's argument that Mr. Malkan was non-renewed because the Program was being replaced by a more comprehensive Legal Skills Program rather than as a pretext masking some inappropriate motive for Mr. Malkan's non-renewal. Dkt. #70-3, pp.29-30. As a result of this determination, the PERB charge was dismissed. Dkt. #70-3, p.30.

By letter dated November 22, 2011, Mr. Malkan advised the PERB  ALJ "that Makau Mutua committed perjury in your courtroom on March 31 and April 1, 2010." Dkt. #84-1, p.2. By letter dated November 28, 2011, plaintiff advised the Hon. Jeremiah Moriarty, III, New York State Court of Claims,[1] that he was "accusing Makau Mutua of committing perjury in the PERB proceeding that is running parallel to this case." Dkt. #84-1, p.3.

On March 23, 2012, plaintiff commenced this action pursuant to 42 U.S.C. § 1983, alleging that Dean Mutua deprived plaintiff of his property interest in a "405(c)-

---

[1] Plaintiff filed two claims alleging that the State had breached an employment agreement between plaintiff and Dean Olsen. Dkt. #72, ¶ 19, n.5. Plaintiff's initial claim was dismissed for failure to state the total sum claimed and his second claim was dismissed as untimely. Dkt. #73-6, p.4. Plaintiff's application to file a late claim was denied by Decision and Order entered March 23, 2015 for failure to establish merit. Dkt. #73-6, p.7. Specifically, the Court of Claims determined, *inter alia*, that "it was the president of the University at Buffalo, and not the dean of the School of Law, who served as the chief administrative officer . . . and possessed the power to make term appointments." Dkt. #73-6, p.8. In any event, the Court of Claims noted that the maximum duration of a term appointment was three years, with an automatic expiration at the end of the designated term, without legal right, interest or expectancy to any other appointment or renewal. Dkt. #73-6, p.8.

qualified, presumptively renewable contract and university title/rank of full clinical

professor" without due process, *to wit*, review by the Committee on Clinical Promotion

and Renewal ("CCPR").  Dkt. #1.


      By letter dated September 5, 2012, plaintiff informed SUNY Buffalo

Provost Charles Zukoski that

> On two previous occasions, November 11, 2011 and June
> 18, 2012, I informed President Satish K. Tripathi that Dean
> Makau W. Mutua committed perjury in the first degree at the
> hearing of the Public Employment Relations Board (PERB)
> in Albany on March 31 and April 1, 2010.  . . . At this point, I
> beleive President Tripathi is complicit in the cover-up of a
> crime by a high-ranking member of his administration, which
> could have calamitous consequences for himself, for the law
> school, and for the university.

Dkt. #84-1, p.5.


      By letter dated September 13, 2012, the AAG requested of counsel for

plaintiff that plaintiff be instructed to cease "improper contact and communication[2] with

the Defendants, SUNY's staff including the President, Dean and Provost and some

thirty members of the SUNY staff."  Dkt. #70-4, p.16.


      By letter dated November 20, 2012, Mr. Ostrove advised AAG Sleight that

more than fifteen of the responses contained in defendants' Answer violated Rule 11.

---

[2] Samples of Mr. Malkan's letters and e-mails to SUNY staff, SUNY Buffalo Council,
SUNY Buffalo Law School Dean's Advisory Council, the Attorney General's Office and media
outlets accusing Dean Mutua of subverting the judicial process, swearing to false testimony,
committing perjury, and engaging in criminal misconduct and defamation, and accusing  SUNY
officials and the AAG of complicity, are attached at Dkt. #72-5; Dkt. #84-1; Dkt. #84-2; Dkt.
#92-1 & Dkt. #94-1.

Dkt. #70-4 , pp.2 & 4-5.  As relevant to the instant motion, Mr. Ostrove argued with

respect to paragraph 11 that "it is within Defendants' knowledge whether Malkan was

recommended to full Clinical Professor especially considering that Mutua testified

previously to this very issue."  Dkt. # 70-4, p.4.

On February 27, 2013, plaintiff posted a copy of his statement in

anticipation of mediation on the internet, where it remains available for public view.  *See*

http://www.scribd.com/doc/217761477/statement-of-facts-and-damages-submitted-2-

27-2013.  Mediation was conducted on March 1, 2013 and April 2, 2013. Dkt. #34 &

Dkt. #35.

An article in the SUNY Buffalo Spectrum published April 28, 2013 detailed

Mr. Malkin's accusations in this lawsuit and outlined concerns of Law School faculty

regarding Dean Mutua's leadership.  Dkt. #84-1, pp.11-13.  Mr. Malkan is also reported

to have discussed the mediation proceedings with the Spectrum:

> Malkan said he was there with his attorneys, along with
> Ewing, SUNY Counsel Jim Jarvis, Esq., and Assistant
> Attorney General David Sleight.
>
> According to Malkan, Mutua did not show up to the
> mediation, claiming that he had more important business
> elsewhere.  Malkan claims this is a violation of the rules.
>
> Malkan also claims the attorney general asked for time until
> March 21 to come back with a settlement offer but later
> asked for an extension until April 2.  The attorney general
> informed Malkan that UB declined to make any settlement
> offer, saying the case will be going to trial in federal court
> before the end of 2013.

"This is disappointing, of course, because over the five years of this dispute SUNY Buffalo has refused to make any settlement offer at all, not one dollar, and has blocked me from obtaining a teaching job at any other law school," Malkan wrote in an email.  "I'm also afraid that the trial in federal court will be harmful to the law school's reputation because the facts that will be revealed will not be flattering."

Dkt. #84-1, p.12.


Dean Mutua moved for summary judgment in this action on June 7, 2014.

Dkt. #55.  In his Statement of Undisputed Facts, Dean Mutua asserted that:

There is sharp disagreement regarding what occurred at the meeting and what exactly the Committee voted on.  Malkan and several third party witnesses deposed in this action claim that a vote was taken on whether the Committee should recommend to the Dean that he be promoted to full Clinical Professor, and that the vote was in his favor. Defendant Matua [sic], on the other [hand], recalls that the meeting quickly devolved to a discussion of whether Malkan should continue as Director of the Research and Writing Program, and that a vote was eventually taken on whether the Committee would recommend that the Dean offer Malkan a terminal one year appointment, and that vote came out in Malkan's favor.

Dkt. #56, ¶ 29.


On August 19, 2014, Professor Ewing[3] and seven other law school faculty members filed a complaint against Dean Mutua with the New York State Appellate Division, Fourth Department Attorney Grievance Committee.  Dkt. #74, ¶ 11.  In response to that complaint, Dean Mutua advised the Grievance Committee that:

---

[3] Professor Mutua notes that he removed Professor Ewing from an administrative appointment as Vice Dean for Academic Affairs on May 27, 2014.  Dkt. #74, ¶¶ 7 & 10.

> I have testified that I was present at the meeting of the
> Committee on Clinical Promotion and Renewal (CCPR) at
> SUNY Buffalo Law School on April 28, 2006 at which Jeffrey
> Malkan's employment was discussed.  I recall, and repeat
> here for clarity, that the CCPR only voted to authorize the
> Dean of the Law School to offer Malkan a one-year terminal
> contract as Director of the Research and Writing Program
> because he was universally viewed as incompetent.
> According to my recollection, the CCPR did not hold a vote
> on a second question of whether Malkan would have been
> considered for promotion from Associate Clinical Professor
> to full Clinical Professor.  I have maintained throughout that
> Malkan could not be legally promoted to the rank of Clinical
> Professor since he was not a clinician and had never taught
> in the clinics.  The CCPR meeting was heated and
> rancorous and broke up after the vote to grant Malkan a
> terminal one-year contract.  These are the facts as I
> remember them and as I have truthfully testified in several
> legal proceedings.  By practice and tradition of the Law
> School, no formal or official written record of CCPR
> meetings is kept.

Dkt. #74-3, p.2.


On September 22, 2014, SUNY at Buffalo Provost Charles Zukoski

announced Dean Mutua's resignation as Dean of SUNY Buffalo Law School, effective

December 19, 2014.  http://www.buffalo.edu/provost/messages/mutua.html.


On October 18, 2014, Mr. Malkan sent a letter to AAG Sleight, copied to

Mr. Ostrove, attaching a copy of his complaint to the Public Integrity Bureau of the

District Attorney of Albany County because:

> You have stated facts in your filings to the Western District
> that you know are untrue, on the word of your client, against
> all other evidence, and done no investigation at all. I believe
> that you have violated Rule 11 of the Federal Rules of Civil
> Procedure and I have instructed my attorneys to file a
> motion for sanctions against you.

I also believe that you have violated numerous provisions of the New York Rules of Professional Conduct and have thereby assisted your client in perpetrating a fraud on this Court.

Finally, you are aware that your client gave the same false testimony to a state administrative agency, PERB, on March 31-April 1, 2010.  This false testimony had the effect of causing a miscarriage of justice.

I am not threatening to prosecute Dean Mutua. I have filed charges that I expect will result in his prosecution. He has committed a crime against the judicial process for which he must answer, entirely apart from my civil actions in the Court of Claims and this court.

Dkt. #72-6, p.2.

By e-mail dated October 23, 2014, AAG Sleight advised Mr. Ostrove:

I presume you know about your client's October 18, 2014 letter to me.  In it, he advised me that he believes that I have stated facts in my court submissions, on the word of my client, that I know to be untrue.  He goes on to state that he has instructed the two of you to file a Rule 11 motion for sanctions against me.  He then posted this letter on a list server and sent an e-mail to the entire faculty of the UB Law School and various UB administrators with a link to the letter.

Needless to say, I am not pleased that your client has now decided to expand his sphere of rage and vitriol by engaging in personal, public attacks on my integrity as a lawyer when I am just doing my job and representing my client pursuant to the obligations that I owe him as an attorney. . . .

What is even more alarming than your client's threat of a frivolous Rule 11 sanctions motion is his intimation that . . . you may actually be considering bringing such a motion on his behalf.

Dkt. #70-3, p.34.

-12-

By e-mail dated October 27, 2014, Mr. Ostrove advised AAG Sleight that:

Rule 3.3 precludes you from using or offering evidence that you "know" to be false.  If you "know" the testimony is false, you also have a duty to remedy the false testimony and not submit it to a court.  Below you have not argued that you don't "know" your client's testimony to be false.

However, I assume you may argue that you don't "know" it [sic] false based on "the word" of your client.  Rule 3.3 does not allow you to blindly accept the word of your client.  According to Comment 8, a lawyer "cannot ignore an obvious falsehood."  Comment 8 indicates that you have to have a "reasonable belief" that the testimony is truthful.  NYCLA Opinion No. 741 (attached) sheds additional light on the issue.  It provides a discussion of "knowledge" in this context. Under this opinion, which cites a Second Circuit Opinion, a lawyer cannot rely on his client's statements if it is unreasonable to do so.  See also *In re Grivance [sic] Committee of the United States District, District of Connecticut, John Doe*, 847 F.2d 57, 63 (applying an objective test to whether a lawyer has actual knowledge by noting that the lawyer must have a "reasonable" belief that his client is being truthful).  The objective portion of the "knowledge" rule is necessary, otherwise everyone would just say they believe their client, regardless of how unreasonable that belief may be.

Other than your client's "word," there is no basis to believe the truth of Mutua's statement.  Given the <u>overwhelming</u> evidence disputing your client's testimony, no reasonable person could believe him. . . .

. . . RPC 1.0(k) specifically says that "knowledge may be inferred from the circumstances."  Having read the overwhelming evidence disputing your client's position, any reasonable person would have to conclude that Mutua definitely lied.

In your 56.1 statement, you offered Mutua's false testimony as evidence there was a sharp dispute regarding whether Malkan was promoted.  I provide you with this case law and remedy to give you a chance to remedy this on your own.  I sympathize with the fact that you are in a difficult position, and I don't like sending you this email.  But, it is your client's

perjury which has put us both in this position.  Obviously,
you will take whatever actions you think appropriate.  But, I
suggest that before you decide how to proceed, you review
the information I have provided, carefully consider your
options, and possibly conduct additional legal research.

Dkt. #70-3, pp.32-33.


By e-mail dated November 3, 2014, AAG Sleight advised Mr. Ostrove that:

I suggest you read *Doe v. Federal Grievance Committee*,
847 F.2d 57 (2d Cir. 1988), more closely, and also read
subsequent decisions that cite it, for a fuller understanding
of the knowledge standard.  I also remind you that the
bringing of a baseless Rule 11 motion is in itself
sanctionable conduct.

Dkt. #70-3, p. 32.


By e-mail dated November 24, 2014, following receipt from plaintiff of an

e-mail accusing AAG Sleight of violating the Rules of Professional Conduct, AAG

Sleight requested that plaintiff's attorneys instruct plaintiff to stop communicating with

him directly.  Dkt. #84-3.


By e-mail dated December 5, 2014, plaintiff advised Professor Ewing and

Professor Mangold, as well as numerous other faculty members at SUNY Buffalo Law

School that: "I have to find $25,000 by next week to finance my Rule 11 motion."[4]  Dkt.

#73-3, p.2. Mr. Malkan's e-mail continued: "[t]he University's disrespect and defiance

has continued to the point that I have to demand that my lawyers, against their own

---

[4] Plaintiff subsequently declared that this $25,000 was the balance due as of that date
for the Firm's work on the summary judgment motion.  Dkt. #88, ¶ ¶ 66 & 72.

wishes, hold the AAG personally responsible for the fraudulent pleadings he has

signed." Dkt. #73-3, p.2.

> By e-mail dated February 20, 2015, Mr. Ostrove advised AAG Sleight:
>
> I am convinced that you know your client has lied in two
> proceedings about material issues.  Any rational person
> would easily reach that conclusion, despite your client's
> "word."  I am sorry that I have been put in the position to
> force you to take action and I wish you corrected this without
> warning.  Nonetheless, here is one more, final warning: you
> and your client have 21 days safe harbor to take corrective
> actions before I file the attached motion.

Dkt. #70-3, p.37.  Mr. Ostrove attached a copy of his Notice of Motion and

Memorandum of Law in Support of the Sanctions Motion to his e-mail.  Dkt. #70-3, p.37

& Dkt. #70-7, p.13.

> By letter dated March 12, 2015, AAG Sleight responded as follows:
>
> Your draft motion argues that I have violated Rule 11
> because I cite Mr. Matua's [sic] allegedly perjurious
> testimony in my Rule 56.1 statement.  As is clear from that
> paragraph you reference, I am not citing Matua's [sic]
> testimony or the testimony of the other deponents in this
> action for the truth of the matter asserted; rather, I included
> that paragraph and cite that testimony only for the purpose
> of providing continuity to the narrative and to identify a fact
> issue for the Court.  I have never cited Matua's [sic]
> testimony regarding what occurred at the Committee on
> Clinical Promotion and Renewal meeting for the truth of the
> matter asserted, nor would I, because, as our Summary
> Judgment Motion reflects, we do not think it is relevant to the
> legal issues in this case.  While your client seems to be
> obsessed with all things Makau Matua [sic] and, in particular,
> what Mr. Matua [sic] says about what occurred at the
> Committee on Clinical Promotion and Renewal meeting, it is
> irrelevant to his due process claim. What is relevant is what
> happened afterward.

Our separate and independent grounds for summary judgment are threefold.  First, that your client did not have a protected liberty interest because he did not have a legitimate expectation of continued public employment based on the letter agreement between him and Nils Olsen. . . . Thus, we do not deny that your client was offered and accepted a term appointment as a clinical professor that expired on August 31, 2009. . . . What we do deny, however, is that your client had a legitimate expectation of continued employment past August 31, 2009 based on his contract with Olsen, because Olsen was prohibited by the SUNY Board of Trustees' policies from offering him a term appointment longer than three years, and your client knew it.

Your draft motion papers also misstate the law on the knowledge standard applicable to both Rule 11 and RPC 3.3.  As you acknowledge in your draft memo of law . . . there is no case law interpreting the definition of "actual knowledge" under RPC 1.0(k).  There is, however, a Second Circuit decision that discussed the "actual knowledge" standard and that case is binding precedent on our court.  I previously encouraged you to read the decision in In Re Doe, 847 F.2d 57 (2d Cir. 1998), and cases that cite it, more closely.  Instead, you have either not done so, or you have applied sophistry to its clear meaning in order to mold it to your purposes.  Doe does **not** support the proposition that a lawyer's "actual knowledge" of a witness's false testimony is judged by an objective standard.  In fact, to the contrary, it supports the proposition that it is judged by a subjective standard, that is, "actual knowledge."  The Second Circuit in Doe approved of the definition used in Virginia for when "actual knowledge" is clearly established.  Id. at 62.  "'[I]nformation is *clearly established* when the client *acknowledges* to the attorney that he has perpetrated a fraud on the court.'"  Id. (emphasis in original).  That is not an objective standard.  The Second Circuit went on to cogently explain why actual knowledge had to be the standard:

\* \* \*

. . . Thus, in Doe, and all of the cases that I have found that cite it for its interpretation of "actual knowledge," what courts find determinative is whether evidence of actual intentional misconduct has been brought to the attorney's attention. [citing 6 cases].

> Additionally, New York's RPC is essentially the State's adoption of the ABA Model Rules of Professional Conduct (1983). In ABA Formal Opinion 87-353, the "actual knowledge" standard is discussed. . . . That Opinion advises that it will be "the unusual case" where the lawyer "does know" that a client intends to commit perjury, and that knowing can only be established by the clients "clearly stated intention" to perjure himself. Id.
>
> Where is your evidence in this case that I know that Mr. Matua [sic] intentionally testified falsely at his deposition? There is no evidence that Mr. Matua [sic] ever acknowledged to anyone that his testimony was false, let alone to me. In fact, his testimony at his deposition was entirely consistent with the testimony he gave at the PERB hearing. All you have here is one witness to an event that remembers it one way and other witnesses that remember it another way; which is the most usual of circumstances in litigation where memory is involved. At best, this is evidence that might lead me to suspect that Mr. Matua's [sic] recollection of the event is not accurate; however it is not evidence that leads me to believe he is intentionally lying. There is a distinction and you know this, or at least you should. What you are doing here is asking me to weigh evidence and assess the credibility of witnesses in order to come to a conclusion on an issue of fact. That is not my job as counsel; that is the job of the trier of fact. . . .
>
> \* \* \*
>
> . . . if you proceed, I will file a cross motion for sanctions against you and your client. Your draft motion is frivolous, has no basis in law or fact, and appears to serve no other purpose than to harass and vex me.

Dkt. #73-5, pp.2-5.

On April 14, 2015, plaintiff filed his motion seeking sanctions against

Professor Mutua and AAG Sleight pursuant to Rule 11 and the court's inherent power.

Dkt. #70.

In opposition to plaintiff's motion for sanctions, Professor Mutua declares "unequivocally that I testified truthfully and to the best of my recollection at both Plaintiff's PERB hearing and at my deposition in this case."  Dkt. #74, ¶ 3.

On June 19, 2015, the Attorney General's Office served Mr. Ostrove with a Notice of Motion seeking sanctions against Mr. Ostrove, Leeds Brown Law, P.C. and Mr. Malkan, as well as a copy of AAG Sleight's letter, dated March 12, 2015, setting forth the basis for defendant's motion for sanctions.  Dkt. #84-5 & Dkt. #90, ¶ 20.

By e-mail dated June 23, 2015, Mr. Malkin advised the faculty at UB Law School that he "will defy any civil contempt citation entered against me, so you will continue to receive information about this case throughout next year."  Dkt. #84-2, p.140.

On June 26, 2015, Mr. Malkan advised Mr. Ostrove that he intended to terminate the services of Leeds Brown Law, P.C.  Dkt. #90, ¶ 22.

On July 15, 2015, counsel moved to withdraw and have the sanctions motion deemed filed solely by plaintiff, *pro se, nunc pro tunc*.  Dkt. #80.  In doing so, counsel declared that the "Firm and I wish to exercise our safe harbor rights."  Dkt. #90, ¶ 31.  However, counsel further declared that

> our safe harbor exercise is unrelated to the merits of the
> motion.  Prior to filing our sanctions motion, multiple
> attorneys from the Firm and I reviewed the situation

> exceptionally carefully.  We reviewed every case to which
> the AG directed us as well as numerous other cases.  I am
> 100% positive that the motion for sanctions is well grounded
> in fact and law, and is therefore not frivolous.

Dkt. #80-1, ¶ 5.

By Text Order entered July 16, 2015, the Court terminated Leeds Brown

Law, P.C. as counsel for plaintiff but directed the Clerk of the Court to

> identify Frederic D. Ostrove as an Interested Party so that he
> continues to receive notice of electronic filings.  Plaintiff's
> request to deem the motion for sanctions as filed by plaintiff
> nunc pro tunc is denied.  As the affiant to the Motion for
> Sanctions, Mr. Ostrove is granted permission to respond to
> defendant's anticipated motion for sanctions to the extent
> that such motion may challenge Mr. Ostrove's conduct as
> counsel on behalf of plaintiff prior to his withdrawal from this
> action.  The Clerk of the Court shall identify Plaintiff as
> proceeding pro se and direct correspondence to plaintiff
> at . . . Saint James, New York 11780.

Dkt. #81.

On July 22, 2015, Mr. Malkan filed a declaration in support of his motion

for Rule 11 sanctions against Professor Mutua and AAG Sleight, stating, *e.g.*,

> The judicial process is based on the understanding that
> there are undisputed facts that are accessible to the
> common knowledge of responsible and mentally competent
> human beings.  That includes lawyers and law professors.
> Everyone on the Law School faculty has *actual knowledge*
> of what happened in the P&T Committee meeting, even if
> they were not in the room, and so does Mr. Sleight.
>
> * * *
>
> Any reasonable inquiry based on the record in this litigation
> and the related legal proceedings in state court would

-19-

> confirm that the evidence of Makau W. Mutua's perjury is not
> just compelling, but conclusive.  The truth is that former-
> Dean Mutua committed perjury and that President Tripathi
> obstructed justice in a manner that is strikingly similar to the
> cover-up by the administration at Penn State University of its
> athletic program's scandal.

Dkt. #82, ¶ 58.  Mr. Malkan declares that despite "the benefit of hundreds of hours of

donated legal work from the union and . . . countless hours of my own legal time . . . the

meter on my private attorneys ran to over $140,000 before I exhausted my last

resources earlier this summer."  Dkt. #82, ¶ 90.  Mr. Malkan declares that he is currently

"impecunious."  Dkt. #82, ¶ 90.


On July 23, 2015, defendant filed his motion seeking sanctions against

Mr. Malkan, Mr. Ostrove and Leeds Brown Law, P.C., pursuant to Rule 11, 28 U.S.C.

§ 1927 and the Court's inherent power.  Dkt. #83.  Defendant seeks dismissal of this

action with prejudice; an order directing plaintiff to cease his harassment of Mr. Mutua

and AAG Sleight; an order holding Mr. Malkan in civil contempt for his disclosure of

mediation proceedings; referral of Mr. Malkan and Mr. Ostrove for discipline due to

possible violations of the New York State Rules of Professional Conduct; and attorneys'

fees and costs.  Dkt. #83.


## DISCUSSION AND ANALYSIS

**Fed. R. Civ. P. 11(a)**

Rule 11(a) of the Federal Rules of Civil Procedure requires that every

pleading, written motion and other paper be signed by at least one attorney of record in

the attorney's name – or by a party personally if the party is unrepresented.  The Rule

further provides that

> By presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b).  "A signature certifies to the court that the signer has read the

document, has conducted a reasonable inquiry into the facts and the law and is

satisfied that the document is well grounded in both, and is acting without any improper

motive." *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.,* 498

U.S. 533, 542 (1991).


        If, after notice and a reasonable opportunity to respond, the court

determines that Rule 11(b) has been violated, the court may impose an appropriate

sanction on any attorney, law firm, or party that violated the rule or is responsible for the

violation.  Fed. R. Civ. P. 11(c).  "A pleading, motion or paper violates Rule 11 if it is frivolous, legally unreasonable, or factually without foundation, even though not signed in subjective bad faith."  *Wechsler v. Hunt Health Systems, Ltd.*, 216 F. Supp.2d 347, 356 (S.D.N.Y. 2002).  The appropriate standard is "an objective standard of reasonable inquiry."  *Business Guides*, 498 U.S. at 554; *See* Fed.R.Civ.P.11 advisory committee.

"Rule 11 is violated when it is clear under existing precedents that a pleading has no chance of success and there is no reasonable argument to extend, modify, or reverse the law as it stands."  *Corroon v. Reeve*, 258 F.3d 86, 92 (2d Cir. 2001); *See Oliveri v Thompson*, 803 F.2d 1265, 1275 (2d Cir. 1986) (sanctions are appropriate "when it appears that a competent attorney could not form the requisite reasonable belief as to the validity of what is asserted in the paper."), *cert. denied sub. nom Suffolk County v. Grascek*, 480 U.S. 918 (1987).  In assessing whether Rule 11 sanctions should be imposed, the court considers "whether the attorney has abused the judicial process."  *Safe-Strap Co., Inc. v. Koala Corp.*, 270 F. Supp.2d 407, 417 (S.D.N.Y. 2003).  If a party's motion for Rule 11 sanctions is not well grounded in fact or law, or is filed for an improper purpose, a court may find itself in the position of imposing Rule 11 sanctions on the moving party and/or his attorney.  *Id.* at 421.  "A Rule 11 violation is . . . a serious thing, and an accusation of such wrongdoing is equally serious."  *Id.*

"The decision whether to impose a sanction for a Rule 11(b) violation is . . . committed to the district court's discretion."  *Perez v. Posse Comitatus*, 373 F.3d 321,

-22-

325 (2d Cir. 2004).  Sanctions under Rule 11 are discretionary.  *Ipcon Collections LLC v. Costco Wholesale Corp*., 698 F.3d 58, 63 (2d Cir. 2012).  "Once a court determines that Rule 11 (b) has been violated, it may in its discretion impose sanctions limited to what is 'sufficient to deter repetition of such conduct.'"  *Margo v. Weiss*, 213 F.3d 55, 64 (2000).  Although dismissal should be imposed only in extreme circumstances, it is an available remedy for Rule 11 violations.  *Safe-Strap*, 270 F.Supp.2d at 418.  Because "the principal objective of the imposition of Rule 11 sanctions is not compensation of the victimized party but rather the deterrence of baseless filing and the curbing of abuses," any monetary sanctions imposed should ordinarily be paid into the court as a penalty.  *Caisse Nationale de Credit Agricole - CNCA, N.Y. Branch v. Valcop, Inc.*, 28 F.3d 259, 266 (2d Cir. 1994).

## 28 U.S.C. § 1927

28 U.S.C. § 1927 provides that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  An award pursuant to this provision, which may be made only against attorneys, "requires a clear showing of bad faith."  *Oliveri,* 803 F.2d at 1273.

## Inherent Power

"A district court's inherent power to sanction derives from the fact that courts are 'vested, by their very creation, with power to impose silence, respect, and

decorum, in their presence, and submission to their lawful mandates.'" *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999), *quoting Chambers v. NASCO*, 501 U.S. 32, 43 (1991). "In order to impose sanctions pursuant to its inherent power, a district court must find that: (1) the challenged claim was without a colorable basis and (2) the claim was brought in bad faith, *i.e.*, motivated by improper purposes such as harassment or delay." *Id.; See Oliveri*, 803 F.2d at 1272 (an award of sanction under the court's inherent power may be imposed for actions taken "in bad faith, vexatiously, wantonly, or for oppressive reasons.").

## Plaintiff's Motion for Sanctions

Perjury

Plaintiff seeks sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure and the Court's inherent power to sanction attorneys for ethical violations against Dean Mutua for perjuring himself during his testimony before PERB and at his deposition and against AAG Sleight for utilizing Dean Mutua's perjurious testimony in  a Rule 56.1 Statement of Facts and implicitly relying upon it in defendants' Memorandum of Law.  Dkt. #70-7.  Essentially, plaintiff argues that because eight non-party witnesses testified that a vote was held to grant plaintiff a full clinical professorship, Dean Mutua's testimony before PERB and at his deposition that no such vote was taken must have been a lie.  Dkt. #70-7, pp.5 & 20.

AAG Sleight argues that "just because witnesses' recollections may differ on what happened during a particular incident does not necessarily mean that one of

them is lying." Dkt. #75, p.4.  AAG Sleight also argues that Dean Mutua's testimony

regarding the CPPR meeting is irrelevant to the legal issues raised before PERB and

this Court.  Dkt. #72, p.4.

In determining what constitutes perjury, the courts "rely upon the definition

that has gained general acceptance and common understanding under the federal

criminal perjury statute, 18 U.S.C. § 1621." *United States v. Dunnigan*, 507 U.S. 87, 94

(1993).  As both plaintiff and his attorney should be aware, "[a] witness testifying under

oath or affirmation violates this statute if [he] gives false testimony concerning a

material matter with the willful intent to provide false testimony, rather than as a result

of confusion, mistake, or faulty memory."  *Id.*  "Differences in recollection alone do not

add up to perjury." *United States v. Sanchez*, 969 F.2d 1409, 1415 (2d Cir. 1992); *See*

*United States v. Schlesinger*, 438 F. Supp.2d 76, 106 (E.D.N.Y. 2006) ("Perjury is not

demonstrated by showing that testimony of a witness is inconsistent with the

statements of another witness.").  Moreover, "[a] statement can be false without being

uttered with the scienter required to render it perjurious." *Margo v. Weiss*, 213 F.3d 55,

63 (2d Cir. 2000).

As there is no evidence before the Court to suggest anything other than

differing recollections of a meeting of tenured faculty on April 28, 2006, there is no basis

for the accusation of perjury against Dean Mutua.  Concomitantly, there is no evidence

to suggest that AAG Sleight possesses actual knowledge that Professor Mutua is lying

about his recollection of that meeting.  AAG Sleight should not be maligned for

accurately depicting witnesses' differing recollections of the meeting in his Statement of

Undisputed Material Facts.  *See Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 388 (2d

Cir. 2003), ("With regard to factual contentions, 'sanctions may not be imposed unless a

particular allegation is utterly lacking in support.'" ), *quoting O'Brien v. Alexander*, 101

F.3d 1479, 1489 (2d Cir. 1996).  In any event, as there is no disagreement over the fact

that plaintiff was promoted to the position of Clinical Professor, the events of April 28,

2006 are immaterial.


Rule 3.3 of the New York Rules of Professional Conduct

       Plaintiff seeks to impose sanctions against AAG Sleight pursuant to the

Court's inherent power based upon AAG Sleight's alleged violation of Rule 3.3 of the

New York Rules of Professional Conduct by submitting Mr. Mutua's perjured testimony

to the Court.  Dkt. #70-7, p.20.  Relying on the definition of knowledge set forth in Rule

1.0(k), plaintiff argues that AAG Sleight's knowledge that Mr. Mutua's testimony is false

may be inferred from the circumstances. Dkt. #70-7, p.21.


       Rule 3.3 of the New York Rules of Professional Conduct provides that a

lawyer shall not knowingly offer or use evidence that the lawyer knows to be false.  N.Y.

Comp. Codes R. & Regs. tit. 22, § 1200.0, Rule 3.3(a)(3).  The definitions for the New

York Rules of Professional Conduct provide that knowingly "denotes actual knowledge

of the fact in question."  N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.0, Rule 1.0(k).

The definition also acknowledges that "[a] person's knowledge may be inferred from

circumstances.  *Id.*

In *Doe v. Federal Grievance Committee*, however, the Court of Appeals for the Second Circuit determined that even subjective beliefs or strong suspicions that a witness is lying are insufficient to meet the actual knowledge standard. 847 F.2d 57, 63 (2d Cir. 1998). In reaching this conclusion, the Court of Appeals explained that:

> If attorneys were bound as part of their ethical duties to report to the court each time they strongly suspected a witness lied, courts would be inundated with such reports. Court dockets would quickly become overburdened with conducting these collateral proceedings which would necessarily hold up the ultimate disposition of the underlying action. We do not believe that the Code's drafters intended to throw the court system into such a morass. Instead, it seems that the only reasonable conclusion is that the drafters intended disclosure of only that information which the attorney reasonably knows to be a fact and which, when combined with other facts in his knowledge, would clearly establish the existence of a fraud on the tribunal.
>
> To interpret the rule to mean otherwise would be to require attorneys to disclose mere suspicions of fraud which are based upon incomplete information or information which may fall short of clearly establishing the existence of a fraud. We do not suggest, however, that by requiring the attorney to have actual knowledge of a fraud before he is bound to disclose it, he must wait until he has proof beyond a moral certainty that fraud has been committed. Rather, we simply conclude that he must clearly know, rather than suspect, that a fraud on the court has been committed before he brings this knowledge to the court's attention.

*Id.* In that case, even though an adverse witness had informed the attorney's client that he had been instructed to change his story at his deposition and subsequently informed the attorney's client that he had followed his attorney's instructions and lied at his deposition, and even though attorney believed that the adverse witness had lied at his deposition based upon his own independent conclusions drawn from his knowledge of the case, the Court of Appeals concluded that the attorney lacked actual knowledge that the witness committed perjury. *Id.*

In *United States v. Shaffer Equipment Co.*, in contrast, the Court of Appeals for the Fourth Circuit determined that an attorney possessed actual knowledge of misstatements by an expert witness where the expert witness admitted to that attorney that he had lied about his credentials and the attorney confirmed with the University cited on the expert witness' *curriculum vitae* that the witness had not received a degree.  11 F.3d 450, 459 (4th Cir. 1993).  Similarly, in *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, the district court determined that, *inter alia*, a printer's statement that he did not conduct business with the defendant in 1993 provided the lawyer with actual knowledge that his client's declaration that the label his client declared had been printed by that printer in 1993 was false.  No. 98 CIV 10175, 2002 WL 59434, at *7 (S.D.N.Y. Jan. 16, 2002).

In the instant case, as set forth above, there is no evidence before the Court to suggest that Dean Mutua testified falsely as to his recollection of events on April 28, 2006, let alone that AAG Sleight possesses actual knowledge that Dean Mutua testified falsely.  As the ABA Commission on Ethics and Professional Responsibility opined:

> It must be emphasized that this opinion does not change the professional relationship the lawyer has with the client and require the lawyer now to judge, rather than represent the client.  The lawyer's obligation to disclose client perjury . . . is strictly limited . . . to the situation where the lawyer knows that the client has committed perjury, ordinarily based on admissions the client has made to the lawyer.  The lawyer's suspicions are not enough.

Formal Op. 87-353 (1987) (footnote omitted). Thus, as the Court of Appeals concluded

-28-

in *Doe*, the proper forum for challenging Professor Mutua's credibility and resolving questions regarding the accuracy of Professor Mutua's recollection is not a collateral proceeding for sanctions against counsel, but a trial.  847 F.3d at 63.


<u>Answer</u>

Plaintiff seeks to sanction AAG Sleight pursuant to Rule 11 for failing to amend the answer to admit the allegations contained in paragraph 11 of his complaint "upon learning that Mutua had perjured himself regarding the tenure vote."  Dkt. #70-7, p.12, n.4.  Paragraph 11 of the Complaint alleges:

> On April 28, 2006, upon a review of his job performance, applying the faculty's scholarship, teaching, and service standards, the Promotion and Tenure Committee recommended that Malkan be reappointed to the position of full Clinical Professor with the protections of ABA Standard 405(c) and accompanying interpretations, which requires law schools to protect the academic freedom of clinical professors by providing them with job security reasonably similar to tenure.

Dkt. #1, ¶ 11 & Dkt. #70-7, pp. 5 & 11.


AAG Sleight declares that he denied knowledge or information sufficient to form a belief as to the truth or falsity of the allegation contained in paragraph 11 because

> the allegations are not precise.  It alleges that the Promotion and Tenure Committee met on April 28, 2006, when it was the Committee on Clinical Promotion and Tenure.  It alleged that Plaintiff was reappointed to the position of full Clinical Professor when in fact from what I knew at the time the issue at that meeting was his promotion from Associate Clinical Professor to full Clinical Professor. It alleged that the

> faculty reviewed Plaintiff's job performance, applied the
> faculty's scholarship, teaching, and service standard, and I
> did not know that to be the case one way or the other.  And,
> it alleged that the appointment was "with the protections of
> ABA Standard 405(c) and accompanying interpretations,
> which require law schools to protect the academic freedom
> of clinical professors by providing them with job security
> reasonably similar to tenure," which I did not know to be the
> case one way or [the] other.

Dkt. #72, ¶ 20.  AAG Sleight further declares that if he were to amend his Answer, he

would deny the allegations.  Dkt. #72, ¶ 28.  In any event, AAG Sleight responds, *inter*

*alia*, that Rule 11 applies only to the attorney's conduct at the time of signing and

cannot be used to sanction counsel for failing to amend a pleading.  Dkt. #75, p.10.

> Rule 11 applies only to the initial signing of a "pleading,
> motion, or other paper."  Limiting the application of rule 11 to
> testing the attorney's conduct at the time a paper is signed is
> virtually mandated by the plain language of the rule.

> * * *

> Moreover, the advisory committee note to the amended rule
> states that the signer's conduct is to be judged as of the time
> the pleading or other paper is signed.  Fed. R. Civ. P. 11
> advisory committee note.  It is difficult to imaging why this
> comment would be made if the rule were meant to impose a
> continuing obligation on the attorney.

*Oliveri,* 803 F.2d at 1274. "There is thus no obligation to update a pleading, motion or

other paper based on new information provided that the document met the

requirements of Rule 11 at the time it is signed."  *Curley v. Brignoli Curley & Roberts*,

128 F.R.D. 613, 616 (S.D.N.Y. 1989).  "In determining whether the signer has met this

objective requirement, 'the court is to avoid hindsight and resolve all doubts in favor of

the signer.'"  *Id., quoting Oliveri*, 803 F.2d at 1275.

As it is clear that Rule 11 imposes no obligation upon an attorney to amend his pleading, plaintiff has no grounds to move to sanction AAG Sleight regarding the answer.  Moreover, AAG Sleight articulated sufficient  grounds for his denial of knowledge or information sufficient to form a belief as to the truth or falsity of the allegation contained in paragraph 11 at the time the Answer was filed.

### Defendant's Motion for Sanctions

<u>Rule 11 Safe Harbor Provision</u>

Mr. Ostrove argues that defendant failed to follow the appropriate procedure for filing a Rule 11 motion because he failed to provide him or plaintiff with a copy of his memorandum of law or declaration in support of the motion before filing it and the motion did not describe the specific conduct that allegedly violated Rule 11. Dkt. #89, p.4 & Dkt. #90, ¶ 61.

Defendant responds that he complied with Rule 11 by serving a copy of the Notice of Motion and copies of his prior letter accusing counsel of filing a frivolous motion without basis in law or fact for the sole purpose of harassing Professor Mutua and AAG Sleight, delaying resolution of the merits of plaintiff's complaint, and increasing the costs of defending the action.  Dkt. #93, p.3.

> A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or

> denial is withdrawn or appropriately corrected within 21 days
> after service or within another time the court sets.  If
> warranted, the court may award to the prevailing party the
> reasonable expenses, including attorney's fees, incurred for
> the motion.

Fed. R. Civ. P. 11(c)(2).  The law is clear that Rule 11(c)(2) requires only the service of

a motion; it does not require the service of a memorandum of law or affidavits.  *Star*

*Mark Mgmt. v. Koon Chun Hing Kee Soy & Sauce*, 682 F.3d 170, 176 (2d Cir. 2012).

So long as the party subject to the sanctions motion receives notice of the specific

conduct that allegedly violated Rule 11(b), the requirements of Rule 11(c) are satisfied.

*Id.; Storey,* 347 F.3d at 389.


AAG Sleight served his Notice of Motion and his letter of March 12, 2015

upon Mr. Ostrove on June 19, 2015.  Dkt. #84-5, p.5.  In accordance with those

documents, Mr. Ostrove received notice of the potential for Rule 11 sanctions based

upon AAG Sleight's allegation that Mr. Ostrove's motion for sanctions was based upon

an erroneous legal standard and false factual predicate.  Dkt. #84-5, pp.6-9.  Mr.

Ostrove did not withdraw his motion for sanctions within 21 days of service of that

notice of motion as would allow him and his client to claim refuge in the safe harbor

provision of Rule 11.  In fact, Mr. Ostrove did not withdraw his motion for sanctions at

all, but merely attempted to shift responsibility for the consequences of the motion to his

client following his termination as plaintiff's counsel.  The Court will not permit counsel

to escape responsibility for improper conduct simply because he was subsequently

terminated as counsel.  As Mr. Malkan encouraged the filing of the motion for sanctions

and adopted the arguments contained in the motion following his termination of Mr.

Ostrove, defendant's motion for sanctions against Mr. Malkan is also properly before this Court.

Frivolousness of Plaintiff's Rule 11 Motion

Defendant argues that plaintiff's Rule 11 motion is frivolous and warrants a substantial monetary sanction to deter Mr. Ostrove and Leeds Brown Law, P.C. from such conduct in the future.  Dkt. #83-1, pp.6 & 8-9.  In light of Mr. Malkan's dire financial situation, defendant seeks dismissal of this action as an appropriate sanction against plaintiff.  Dkt. #83-1, p.9.

Mr. Ostrove responds that the motion for sanctions was appropriate because "an objective assessment of the facts compels the conclusion that Mutua lied." Dkt. #89, p. 10.

In a declaration in opposition to the motion for sanctions, Mr. Malkan states: "My purpose in everything I have said and done since November 11, 2011 has been to report my evidence of former-Dean Makau Mutua's criminal misconduct, not to vex, harass, or defame anyone who stands in the path of my legal claims, nor for any unethical or unlawful reason."  Dkt. #88-2, ¶ 1.  Mr. Malkan declares that:

> The crime I am alleging is subversion of the judicial process by a state official who is also a member of the New York State Bar, a law professor, and the former-Dean of the SUNY Buffalo Law School.  Mr. Sleight is in violation of Rule 11 because he has certified documents based on perjured testimony to this Court without disclosing the perjury, which puts this court in exactly the position Rule 11 is intended to

> prevent.  Mr. Sleight's signature means that he has inquired
> into the facts in a manner that is reasonable under the
> circumstances.  He knows that my allegations on this motion
> are as serious as any allegations in a civil lawsuit can be.

Dkt. #88-2, ¶ 3.

Plaintiff's motion for sanctions against Professor Mutua and AAG Sleight is frivolous.  As AAG Sleight repeatedly attempted to advise, "just because witnesses' recollection may differ on what happened during a particular incident, does not necessarily mean that one of them is lying."  Dkt. #75, p.4.  While the fact that Mr. Mutua's recollection differs from that of every other individual in the room may well suggest that his recollection is faulty, as discussed, *supra*, plaintiff has proffered no evidence that his testimony was intentionally false.  In other words, plaintiff had no factual or legal basis for the accusations of perjury set forth in his Rule 11 motion against Dean Mutua and AAG Sleight.

In addition, given that there was never any dispute that Mr. Malkan was promoted to the position of Clinical Professor, the Court can fathom no reason to fixate on Professor Mutua's recollection of this meeting other than to harass Professor Mutua, needlessly increase the costs of this litigation and unduly burden the court.  Neither plaintiff nor his attorney has ever articulated how plaintiff's claim would be strengthened if Professor Mutua's recollection aligned with the recollection of the other faculty members present at the CCPR meeting on April 28, 2006 nor have they articulated how Professor Mutua's differing recollection compromises plaintiff's claim.

Bad Faith

The same factors which establish the frivolousness of plaintiff's motion for sanctions also demonstrate bad faith.

In addition, as defendant argued in opposition to plaintiff's motion for sanctions, the memorandum of law in support of plaintiff's motion is "riddled with citation to vacated authority, misstated legal standards and goes so far as to quote from an outdated version of Rule 11."  Dkt. #75, p.12.  Plaintiff cites cases, albeit for different points of law, without recognizing that they contradict other arguments being made by plaintiff.  For example, plaintiff cites *Oliveri* as a point of law regarding the Rule 11 standard (Dkt. #70-7, pp.14-15), without acknowledging  that the decision refutes plaintiff's argument that AAG Sleight was obliged to amend his answer. 803 F.2d at 1274 ("[l]imiting the application of rule 11 to testing the attorney's conduct at the time a paper is signed is virtually mandated by the plain language of the rule.").

As a result, sanctions are also appropriate pursuant to 28 U.S.C. § 1927 and the Court's inherent power.

Civil Contempt

Defendant argues that Mr. Malkan should be held in civil contempt for violating local court rules affording confidentiality to mediation proceedings.  Dkt. #83-1, p.12.

"A party may be held in civil contempt for failure to comply with a court order if: (1) the order the contemnor failed to comply with is clear and unambiguous; (2) the proof of noncompliance is clear and convincing; and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Paramedics Electromedicina Comercial, Ltda v. GE Medical Systems Information Technologies, Inc.*, 369 F.3d 645, 655 (2d Cir. 2004)(internal quotation omitted).  "It need not be established that the violation was willful." *Id.*

The Alternative Dispute Resolution Plan provides for confidentiality of all mediation interventions and processes.  Rule 4.4.  The ADR Plan specifically provides that Mediation Memorandum "shall be subject to the confidentiality of the mediation process and treated as a document prepared 'for settlement purposes only.'"  Rule 5.6B.  The ADR Plan is attached to the Automatic Referral to Mediation on the Docket (Dkt. #3), and is available on the Court's public website.[5]  In addition, the Court's Local Rules, which are available on the Court's public website,[6] provide that "[t]he ADR process is confidential."  Rule 16(a).

Plaintiff's disclosure of his mediation statement on the internet and discussion of the mediation proceedings with SUNY Buffalo Spectrum is contemptuous.

---

[5]  http://www.nywd.uscourts.gov/alternative-dispute-resolution

[6]  http://www.nywd.uscourts.gov/rules-individual-local-federal

Sanction

In light of the foregoing discussion, it is recommended that Mr. Ostrove and his firm, Leeds Brown Law, P.C., be sanctioned pursuant to Rule 11, 28 U.S.C. § 1927 and the Court's inherent power in the amount of $10,000, payable to the Clerk of the Court for the Western District of New York.  This sum is selected as a reasonable sum in comparison to the amount of legal fees incurred, yet a sufficient sum to demonstrate the Court's displeasure with counsel's conduct and to deter such conduct in the future.

As to plaintiff, the Court agrees with defendant that a financial sanction would be inappropriate in light of plaintiff's current circumstances.  However, as the Court believes that it is important to the parties and to the integrity of the judicial system that plaintiff's accusations be resolved on the merits, the Court declines to recommend dismissal of this action even though Mr. Malkan's conduct during the course of this litigation would easily warrant even such a severe sanction.

**CONCLUSION**

For the foregoing reasons, it is recommended that plaintiff's motion (Dkt. #70),  for sanctions be denied and that defendant's motion (Dkt. #83), for sanctions be granted in part.

Therefore, it is hereby ORDERED pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72(b).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 72(b) may result in the District Judge's refusal to consider the objection.

The Clerk is hereby directed to send a copy of this Report, Recommendation and Order to the attorneys for the parties.


**SO ORDERED.**


**DATED:**        **Buffalo, New York**
            **December 1, 2015**

                              *  s/ H. Kenneth Schroeder, Jr.  *
                              **H. KENNETH SCHROEDER, JR.**
                              **United States Magistrate Judge**